THE PEOPLE OF THE STATE OF NEW YORK and CHARLES
DEVLIN *vs.* DANIEL D. CONOVER.

All the provisions of the act to amend the charter of the city of New York,
passed April 14, 1857, (except those made specifically applicable to the
succeeding common council,) were in force on the 1st of May, 1857, and
applicable to all city officers then in office. And ample provision being made
by that act for the appointment of heads of departments, by the mayor and
board of aldermen, the act of February 3, 1849, " to provide for filling
vacancies in office," which authorizes the governor to fill vacancies in office
*where no provision is made by law for filling the same*, is inapplicable to the
case of a vacancy occurring in the office of one of the heads of depart-
ments, since the amended charter took effect.

Accordingly, where a vacancy occurred in the office of street commissioner,
by the death of the incumbent, on the 9th of June, 1857; *Held* that the mayor
and board of aldermen had full power and authority to fill the said vacancy;
and they having exercised that authority, by the appointment of D., as
street commissioner, it was *further held* that the latter was legally appoint-
ed, and was entitled to hold the said office, as against C., who had been
appointed to fill the vacancy, by the governor.

Under the act of February 3, 1849, the governor is authorized to appoint only
when a vacancy happens in an office which can be filled at an annual election.

APPEAL from a judgment entered at a special term, on
demurrer to the complaint. The complaint, which was
filed by the attorney general, in behalf of the people and of
Charles Devlin, alleged, *First.* That prior to and on the 12th
day of June, 1857, in the municipal corporation entitled " The
Mayor, Aldermen and Commonalty of the City of New York,"
there was, and still is, an executive department created and
existing under the laws of said state of New York, denomi-
nated the street department, the chief officer of which depart-
ment was, and is called in law, the street commissioner, which
office of street commissioner then was, and ever since hath
been, and still is, a public office in said city. *Second.* That
in November, 1855, one Joseph S. Taylor was duly elected to
the said office of street commissioner of the city of New York,
for the term of three years from the first Monday of January,
1856, and entered upon the duties of said office on the said
first Monday of January, 1856, and continued to fill the said
office, and discharged the duties thereof until the 9th day of

June, 1857, when he died, whereby the said office of street commissioner became, and thence, until and at the time of the appointment hereinafter referred to, was vacant. *Third.* That after the death of the said Taylor, and on the 16th day of June, in the year 1857, the said Charles Devlin was appointed to said office of street commissioner by the mayor of said city, with the advice and consent of the board of aldermen, and that after such appointment, and on the same 16th day of June, 1857, he, the said Charles Devlin, in due form of law, and according to the ordinances of the corporation of said city in that behalf made and provided, gave sufficient security for the performance of his duties as such street commissioner, in the form and amount for that purpose prescribed by the said ordinances, and took and subscribed, before the mayor of said city, and filed his oath of office in due form. And the said Charles Devlin accepted such appointment and in all respects qualified himself to assume such office and perform the duties thereof. *Fourth.* That on the 12th day of June, 1857, the defendant, Daniel D. Conover, was appointed by the governor of the state of New York, to fill the aforesaid vacancy, created by the death of the said Joseph S. Taylor. That a commission, under the great seal of the state, for his appointment to fill such vacancy, was thereupon issued and delivered to him. That being so appointed he accepted the said office and complied with the requirements of the law and the ordinances of the said city in respect to his oath of office and official bond in such manner that if his appointment were valid and operative he became entitled to execute the said office of street commissioner; but the plaintiffs alleged that the governor had no power, warrant or right, to make such appointment, but that the said Conover, claiming under the same at the said city and county of New York, on the 16th day of June, 1857, without any other or any legal warrant, right, or grant, whatever, intruded into and usurped the said office of street commissioner, and then and from thenceforth, hitherto hath unlawfully held and exercised the said office of street commissioner in the city of New

York, and still doth, under said pretended appointment, so unlawfully usurp, hold and exercise the said office, and all the power and authority thereof, in contempt of the people of the state of New York, contrary to the constitution and laws of said state, to the prejudice of the said people, and to the exclusion of the said Charles Devlin from the said office, and in violation of the rights of said Devlin, under his aforesaid appointment. Wherefore the plaintiffs prayed that the said Daniel D. Conover might answer and show by what warrant he claimed to hold the office of street commissioner; and the plaintiffs demanded judgment against Conover, that he was not entitled to said office, and that he be ousted from such office, and its franchises and privileges, and that the said Charles Devlin be adjudged entitled to the said office and its franchises and privileges, and that the said defendant pay the costs of this action; and for other or further relief.

To this complaint the defendant demurred, on these grounds: *First.* That the complaint did not state facts sufficient to constitute a cause of action against the defendant. *Second.* That it did not show any right or title in the said Devlin to the said office of street commissioner of the city of New York.

After argument of counsel, the court, at special term, ordered and adjudged that the defendant have judgment against the plaintiffs, on the demurrer, with costs. The plaintiffs appealed from the judgment.

*J. T. Brady* and *Charles O'Conor*, for the plaintiffs.

*D. D. Field* and *W. C. Noyes*, for the defendant.

DAVIES, J. Two questions are presented for consideration, in this case: one, whether the defendant is entitled to the office of street commissioner of the city of New York; the other, whether the relator is entitled to the same office. Both claim to have been legally and duly appointed; and this suit has been instituted to determine which is entitled to the office.

The People *v.* Conover.

The defendant claims it by virtue of an appointment made by the governor of the state, on the 12th day of June, 1857 ; and the relator claims it by virtue of an appointment made by the mayor and board of aldermen, of this city, on the 16th of the same month.

It will best tend to a proper examination of the case, to consider, in the first place, the title of the defendant to this office. But before this is done, it may be necessary briefly to refer to the history of the office itself.

This office is one long known in the history of the city government, and was created, and the duties defined, by the by-laws and ordinances of the city. The tenure of the office, mode of appointment, which was by the common council until the incumbent was first elected, in the fall of 1849, and the duties of the office, were all prescribed by ordinance. He was a city officer, created by ordinance, which might be repealed at any time, and holding his office at the pleasure of the common council. His duties were local, and his compensation paid out of the city treasury. No mention is made of the office in any of the city charters prior to that of 1849. By the charter of 1830, the common council was directed to organize and appoint distinct departments to transact the executive business of the corporation. (*See Charter of* 1830, *sec.* 21; *Dav. Laws, p.* 202.) This duty was neglected by the common council till 1839, when among other departments organized was that of the street commissioner. The ordinance of May 9, 1839, organized the department, defined its duties, prescribed the officers therefor, and placed at its head the street commissioner. The amended charter of 1849 continued this department, and the street commissioner as its head, but with greatly enlarged powers and duties. (*See Charter of* 1849, *sec.* 12; *Dav. Laws, p.* 206.) Section 19 of this charter authorized the common council to pass ordinances regulating the duties of these departments ; and the duties of this department were defined by

title 4 of the ordinances organizing the municipal departments, passed May 30, 1849, and all former ordinances repealed.

Frequent reference is made, in the laws of the state, to this officer, as thus established by the ordinances of the city. See chapter 2, Laws of 1830, where the street commissioner, or his assistant or deputy, was authorized to conduct sales of lands for taxes and assessments. From that time, numerous references are made to the same officer. (*See Laws of* 1839, *ch.* 209 ; 1840, *ch.* 326 ; 1841, *ch.* 170, 171, 230 ; 1843, *ch.* 235.) By the amended charter of 1849, the street commissioner was thereafter to be elected by the people, and hold his office for the term of three years. It is thus seen that prior to the passage of the amended charter of 1849, on the 2d of April in that year, the street commissioner was a city officer, created by ordinance of the common council, appointed by that body, and holding his office at their pleasure, and subject to removal and appointment at any time.

At the charter election held in the city in November, 1855, Joseph S. Taylor was elected to the office of street commissioner, for the term of three years from the first Monday of January following. He died on the 9th day of June, 1857 ; and the defendant was appointed by the governor of this state, to that office, on the 12th day of that month. The authority for this appointment is claimed to be found in the 1st section of the act to provide for filling vacancies in office, passed Feb. 3, 1849. (*Laws of* 1849, *chap* 28.) This section declares, " that whenever vacancies shall exist, or shall occur, in any of the offices of this state, *where no provision is now made by law for filling the same,* the governor shall appoint some suitable person, who may be eligible to the office so vacant, or to become vacant, to execute the duties thereof until the commencement of the political year next succeeding the first annual election after the happening of the vacancy at which such officer could be by law elected." At the same session, and on the 2d of April following, the legislature passed the act to amend the charter of the city of New York. (*Laws*

The People *v.* Conover.

*of* 1849, *chap.* 187.) By this charter, as we have seen, the street department was created, and the street commissioner made the head thereof. He was to be elected at the then next charter election, and to hold his office for the term of three years. By the 20th section of this charter it was provided that in case of any vacancy in any of the heads of departments, by removal from office or otherwise, the mayor, by and with the advice and consent of the board of aldermen, should appoint a person to fill the same, until the vacancy should be filled by the electors, at the next succeeding charter election.

Recurring now to the act of Feb. 3, for filling vacancies, we see that it is expressly limited to such vacancies as shall exist or occur, where no provision is made by law for filling the same. When, therefore, any such provision is made, the power thus conferred on the governor is clearly inapplicable. This law could, therefore, have no application to the office of street commissioner, at the time of its passage ; for, full provision was then made for his appointment by the common council, at any time it might suit the wisdom of that body to exercise the power of appointment, either by creating a vacancy by removal, or filling one which might happen from any cause. This law was not intended, clearly, at the time of its passage, to have any reference to this office.

Another reason why in my opinion it was inapplicable to this office is, that the true and obvious construction of the law is to provide for filling vacancies in elective offices, when the appointing power cannot be convened until the next succeeding election. It therefore in terms declares that the person appointed shall execute the duties of the office until the commencement of the political year next succeeding the annual election, after the happening of the vacancy, at which such officer could be by law elected. This language leaves no doubt on my mind that the governor was only authorized to appoint when a vacancy happens in an office which could be filled at an annual election. If it could be construed as applicable to non-elective offices, it is at once perceived that there

is no limitation upon the term of the appointee. Another and controlling reason, to my mind, why it is only applied to elective offices is, that ample provision was already made for keeping full all offices in the state, which were held by appointment. In such cases the appointing power can always be promptly invoked, and any vacancy be speedily filled. While in the case of elective offices, the appointing power, so to speak, is convoked or can act only annually, at the election, and therefore the imperative necessity for placing in some hand ever ready to act, (and none more appropriate than the state executive,) the power to fill the vacancy, until the commencement of the political year next after it happens, and after the election at which it could be supplied. Our state elections occur in November, and the will of the people is not officially ascertained and announced until in December following. It seems to me that this was the obvious meaning of the framers of this law. The evil to be guarded against was, that no office should remain vacant for any considerable period of time, and this was effectually obviated by the provisions of this act. We cannot doubt that these were the motives and considerations which induced its passage. When the amended charter of 1849 was passed for this city, making certain officers in the city elective, it was seen that to prevent the same evil, a similar provision must be made as to them. Hence the like authority, given as we have seen to the mayor and board of aldermen to fill any vacancy in the elective offices of the city, until the same could be supplied at a charter election. This was entirely unnecessary if the previous act of Feb. 3, 1849, was applicable to city officers. If this provision of the charter had been in force, at the happening of the vacancy caused by the death of Mr. Taylor, it is manifest the law of Feb. 3, 1849, would have had no application to it, as provision was fully made by law for filling it, that is by the mayor and board of aldermen. But the charter of 1849 was repealed by the act to amend the charter, passed April 14, 1857, which went into effect on the first of May, 1857. But by the last

The People v. Conover.

mentioned charter the street commissioner ceased to be an elective officer, and therefore no person could be elected to succeed the appointee of the governor, and there would consequently be no termination of his office. It therefore follows, I think, that this office is one not contemplated by the law of Feb. 3, 1849, and not within its meaning and spirit; and if there was any provision for filling this vacancy, by law, at the time it happened, this office is excluded from the operation of this act by express words and its clear import. The defendant has not, therefore, any valid or legal title to the office of street commissioner.

The next inquiry is, has the relator any title to the office? This depends upon two considerations : first, whether the provision made in the charter for appointing this officer was in force at the time (April 14, 1857) the vacancy occurred in this office ; and secondly, whether such provision is applicable to this vacancy so as to authorize an appointment. *Bouvier*, (2 *Law Dic.* 619,) describes a vacancy to be a place which is empty. The term, he says, is principally applied to cases where an office is not filled. The appointing power, wherever it may lie, is called into operation as soon as an office is not filled, whether such vacancy is occasioned by death, resignation or efflux of term, or any other cause. As soon as the office is not filled, the appointing power can act. In elective offices, we have seen that an appointing power is only invoked temporarily, until the real appointing power—the electors— can meet and act by election. Now the 19th section of the charter of 1857, after alluding to these city officers, heads of departments, who are to continue elective, declares that "the other heads of departments, (including that of street commissioner,) shall be appointed by the mayor, with the advice and consent of the board of aldermen." If, therefore, this provision of the charter was in force when this appointment was to be made, ample provision was made by law for filling the office ; and the contingency contemplated by the act of Feb. 3, 1849, for invoking the aid of the state executive, did not

arise. It is clear, specific and direct, that this officer shall be appointed by the mayor and board of aldermen. There is no time specified when they shall appoint, but the fair and natural inference is, that the appointment is to be made whenever the necessity exists for the exercise of that power. But it was earnestly contended on the part of the defendant, that these provisions of the charter of 1857, though declared by the legislature to take effect on the first of May, 1857, did not in fact take effect in reference to, or confer any duties upon, the mayor and board of aldermen then in office, but that the same were only applicable to such officers to be elected at the next charter election, and who were to take office on the first Monday of January following. The position assumed is that all these provisions refer to the future officers to be elected, and not to those in office at the time the charter took effect. If we yield to this argument the result is, that from the first of May last until the first of January, 1858, we in truth had no city government, and the acts of those in office during that time were without warrant of law ; for the charter of April, 1857, repealed the charters of 1830, 1849, 1851 and 1853. They ceased to have any existence on the first of May, 1857, and can it be supposed that the legislature intended to abolish the wholesome restraints contained in them upon the common council and city officers then in office ? If this argument be sound, the mayor and recorder were made again members of the common council, the aldermen judges of the sessions and of the oyer and terminer. The board of councilmen were blotted out of existence, without calling into place for this period any other body. The veto power of the mayor was withdrawn, and in truth the whole affairs of the city government would have been thrown into inextricable confusion, opening wide the floodgates of litigation, and imposing fresh and enormous burthens on our already overtaxed citizens. We cannot yield our assent to these views, and as the case was put before us as mainly turning upon this point, we deem it proper to give it a careful examination.

The People *v.* Conover.

We think such an intent on the part of the legislature, invoking such calamitous results, before we can assent to it should have been clearly and explicitly declared. If such is the law it would be our duty unhesitatingly to yield obedience to it, and in good faith aid in its execution. But we infer that the legislature have in truth declared the contrary. In section 51 it is provided that all officers elected under former laws shall continue in office until those elected under that act shall take office, and no longer.

What is meant by continuing in office? Manifestly, unless otherwise expressed, with the powers and duties then possessed by those officers, who are thus continued, and then conferred, except so far as the same was modified or altered by the charter of 1857. The repeal of the previous charter left them without functions or duties to discharge, unless this view be sound. Denio, justice, in *The People* v. *Draper*, (15 *New York Rep.* 540,) says "public officers without the ability to perform public functions would be an absurdity."

We think, therefore, it clearly follows from the necessity of the case, the very words of the charter of 1857, and the known and obvious intent of the legislature, that all its provisions except those made specially applicable to the succeeding common council, were in force on the first of May, 1857, and applicable to all city officers then in office. That their duties were to be discharged in accordance with the provisions of this new charter, and it was their duty in good faith to execute it and perform those duties. This position being established, as we think it clearly is, the case is free from all difficulty.

Full power was given to the mayor and board of aldermen to appoint this officer, at any time when that power of appointment could be legally exercised, and we think it could be thus exercised whenever the office was empty, or not filled. This was the case on the 9th of June, when Mr. Taylor died; and provision being thus made by law for filling the office, the authority conferred on the governor by the act of Feb. 3, 1849,

was inapplicable, and excluded by the express words of that act. It follows that the relator was legally appointed to the office of street commissioner on the 16th of June, 1857, by the mayor and board of aldermen, and is entitled to the office.

Judgment of ouster against the defendant must be given, and judgment for the plaintiffs, and declaring that the relator Devlin is entitled to the office of street commissioner.

SUTHERLAND, J. Prior to and on the 12th day of June, 1857, there was, and still is, an executive department of the municipal corporation known as " the mayor, aldermen and commonalty of the city of New York," called the " street department ;" the chief officer of which department was and is called the " street commissioner," his office being a local, city, public office. In November, 1855, Joseph S. Taylor was elected to the said office of street commissioner, for the term of three years from the first Monday of January, 1856 ; and entered upon the duties of the office, and discharged its duties until the 9th day of June, 1857, when he died. By his death the office of street commissioner became vacant. After the death of Taylor, and on the 16th day of June, 1857, the plaintiff, Charles Devlin, was appointed to the said office of street commissioner by Fernando Wood, then mayor of said city, with the advice and consent of the board of aldermen of said city ; and after such appointment, and on the same day he was so appointed, in due form of law, and according to the ordinances of the corporation of said city in that behalf made and provided, he gave security for the performance of his duties as such street commissioner, and took and subscribed before the mayor of said city, and filed, the official oath required by law. On the 12th day of June, 1857, the defendant, Daniel D. Conover, was appointed by the governor of the state of New York, to fill the vacancy created by the death of Taylor ; a commission under the great seal of the state to fill such vacancy being issued, and delivered to him ; and Conover accepting the office, and complying with

the requirements of the law, and the ordinances of said city, in respect to his oath of office and official bond, in such a manner that if his appointment by the governor was legal and valid, he was and is thereby entitled to exercise the functions of the office. Since the 16th day of June, 1857, Conover, without any other right or title than that conferred on him by his appointment by the governor, and subsequent qualification according to the forms of law, has held and exercised the said office, and all the powers and authority thereof. The question is, which had the right of appointment on the death of Taylor—the mayor, with the advice and consent of the board of aldermen, or the governor?

The question is raised by the demurrer of the defendant to the complaint of the people of the state and Devlin, in an action of the nature of a *quo warranto*, setting forth Devlin's right and title to the office, by the appointment of the mayor, &c., as above stated; Conover's appointment by the governor, &c.; and charging Conover with unlawfully usurping, holding and exercising the office. The demurrer alleges, first, that the complaint does not state facts sufficient to constitute a cause of action against the defendant. Second, that it does not show any right or title in Devlin, to the office of street commissioner. The question comes here by the plaintiff's appeal from the judgment rendered at special term, on such demurrer, on the 25th day of January, 1858.

The plaintiffs insist that the mayor, with the advice and consent of the board of aldermen, had the right to appoint Mr. Devlin, by section 19 of the act to amend the charter of the city of New York, passed April 14, 1857; which section provides that the mayor, comptroller, and counsel to the corporation shall each be elected by the electors of said city, and that the other heads of departments shall be appointed by the mayor, with the advice and consent of the board of aldermen. The defendant insists that, although by section 55 of the act, it was to take effect on the first day of May, 1857; and although by section 51 of the act, Fernando Wood,

mayor of the city when the act was passed, elected under a previous law, to that office, in November, 1856, for the term of three years, was continued in office until a mayor should be elected at the first election of charter officers after the passage of the act ; which election, by the same section 51, was to take place on the first Tuesday of December, 1857 ; yet that it is apparent, from other provisions of the act, and from its general tenor, purpose and object, that the legislature did not intend, by said section 19, to give, and that section did not give, the right and power of appointment thereby conferred in general terms upon the mayor, &c. to the said then mayor.    And the defendant therefore further insists, that as the act of April 2d, 1849 ; the act of July 11, 1851 ; the act of April 12, 1853 ; the act of June 14, 1853, and all laws which, if unrepealed, might have authorized the appointment of Devlin by the mayor, &c., on the 16th day of June, 1857, to fill the vacancy occasioned by the death of Taylor, had been repealed by section 54 of the said act of April 14, 1857, there was, on the 12th day of June, 1857, when he (the defendant) was so appointed by the governor to fill that vacancy, no other provisions made by law for filling it, than the provision made by the act of February 3, 1849 ; which act declares that, "whenever vacancies shall occur in any of the offices of this state, where no provision is now made by law for filling the same, the governor shall appoint some suitable person who may be eligible to the office so vacant, or to become vacant, to execute the duties thereof until the commencement of the political year next succeeding the first annual election after the happening of the vacancy at which such officer should be elected by law."

To Conover's title to the office by appointment by the governor thus set up, and justified under the act of February 3, 1849, the plaintiffs present and insist upon these objections. *First.* If the legislature thereby intended to give the governor the power to fill a vacancy occurring in a mere local, city office, like that of street commissioner, that it is so far unconstitu-

The People *v.* Conover.

tional and void. *Second.* That the act was not intended to give, and did not give, the governor the power to appoint Conover. 1st. Because the office of street commissioner was not, and is not, a *state office*, or an *office of the state*, within the meaning of the act. 2d. Because, by its very terms, it only applies to vacancies in elective offices ; and that it is not reasonable, or in accordance with previous legislation, to suppose that it was intended to apply to any other ; and by the act of April 14th, 1857, (the amended charter,) the street commissioner ceased to be an elective, and became an appointable officer. 3d. That as by section 20 of the act of April 2, 1849, to amend the charter of the city of New York, passed at the same session as the act of February 3d, 1849, the street commissioner was to be elected every three years ; and in case of a vacancy in the office, the mayor, by and with the advice and consent of the board of aldermen, was to fill the vacancy by appointment ; such act of April 2d, 1849, is to be deemed a legislative construction of the act of Feb. 3d, and conclusive evidence that the act of Feb. 3d was not intended to apply to a vacancy in the said office of street commissioner. *Third.* The plaintiffs present Devlin's affirmative title under the amended charter of April 14th, 1857, as a complete answer to Conover's claim under act of February 3d, 1849, and say that "there is nothing in any rule of construction, or in the reason of the thing, to limit the power of appointment given by section 19 of the act of April 14th, 1857, to the mayor, &c. to the single case of a vacancy created by the efflux of time ;" that the whole power of appointment being, by that section, vested in the city authorities, in general terms, they had the right, on the death of Taylor, to appoint Devlin for the full term of the office, as fixed by section 21 of the act.

The objections thus taken to Conover's title, as I have stated them, involve, I believe, all the material questions that have been raised in this case ; and I now proceed to examine them very briefly, though not perhaps *seriatim*, in the order in which they have been stated.. If the governor had no

right to appoint Conover under the act of February 3d, 1849, it does not follow that the mayor had the right to appoint Devlin under the act of April 14th, 1857. I have, therefore, stated the plaintiffs' objections to the defendant's title, in such a manner as to call for the consideration of the right and title of both. And first as to the constitutional question :

In England the governmental divisions of territory into counties, shires, towns, villages and cities, for the greater convenience of government, is as old as the common law. A similar division into counties, towns, cities and villages, has existed in this country, and has been recognized by our constitution and laws, from the first. Necessarily, there have always been certain county, town, village and city public officers, because there have always been certain local public charges and duties to be performed, by some one, corresponding with these territorial governmental divisions. By section 2 of article 10 of the constitution of 1846, " All county officers whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties, or appointed by the boards of supervisors, or other county authorities, as the legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose. All other officers whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed as the legislature may direct." By section 5 of the same article, " The legislature shall provide for filling vacancies in office ; and in case of elective officers, no person appointed to fill a vacancy, shall hold his office by virtue of such appointment longer than the commencement of the political year, next succeeding the first annual election after the happening of the vacancy." The functions and duties of an office constitute the office ; and the local charac-

ter of these duties, and the local interests which the inhabitants of counties, towns and cities, as such, have in the performance of those duties, make the office a county, town, or city office. The office of street commissioner of the city of New York, from the local nature of its duties, is necessarily a city office. It is not a new office. Its duties must have been performed, by some one, long prior to 1830, and as early as 1830 it was recognized by the ordinances of the common council of the city by the title of street commissioner. By section 21, of the act of April 7th, 1830, it was made the duty of the common council of the city to organize distinct departments, for the performance of the executive business of the corporation. Accordingly a department, known as the street commissioner's department, was organized, with its chief officer known as the street commissioner. His office, known and recognized as the street commissioner's office or department, was continued, and was existing when the constitution of 1846 took effect. Conceding, therefore, since the decision of the court of appeals, in the case of *The People* v. *Draper*, (15 *N. Y. Rep.* 532,) that the reservation to the electors or local authorities of the right to elect or appoint county, city, town and village officers, contained in sec. 2 of art. 10 of the constitution, relates only to such officers as existed when the constitution took effect, the city of New York has the full strength of the constitutional reservation or guarantee of that section, that the street commissioner shall be elected by the electors thereof, "or appointed by such authorities thereof, as the legislature should designate for that purpose." There is nothing in this section of article 10 limiting this general right of election, or of appointment, to fill a vacancy which has occurred or is anticipated from efflux of time, or from the expiration, or anticipated expiration, of the full official term of the incumbent. The whole right of election, or of appointment, is vested in the electors or city authorities. The legislature can as well designate the city authorities which shall appoint to a vacancy occasioned by

death, as to one occasioned by efflux of time; and the legislature can as well designate the city authorities which shall appoint to fill a vacancy in an *elective* office occasioned by death, as a vacancy ocasioned by the death of an *appointable* officer; and thus the legislature can, in *all cases* of a vacancy, secure to the city an appointment by its own authorities. General power to appoint, without words of limitation or exception, would carry with it the power to appoint in all cases where the office is not filled. By section 5 of the same article of the constitution, " the legislature shall provide for filling vacancies in office," &c. If this section applies to vacancies in the city, town, and village offices mentioned in section 2, as not provided for in section 2; then, it appears to me, that taking the two sections together, their fair and reasonable construction is, to limit the power of the legislature as to such vacancies, to the power of designating and providing whether they shall be filled by the electors of the city, &c. by election, or by the authorities of the city, &c. by appointment; and if by appointment, the authorities thereof that shall make the appointment. Section 2 of article 10 is to be looked upon as reserving or guarantying to cities, towns, &c. certain rights of local territorial self-government, *as against the legislature.* In looking for the extent of this reservation—the fair meaning and intent of this section—it will not do to start with the theory of the omnipotence of the legislature, and then reason back for the rights of the cities, towns, &c. The omnipotence of governments— whether founded on the great political as well as legal principle of the feudal law, *that territory confers jurisdiction;* or on divine authority; or on military power—has no place in our institutions of government. The problem in constructing our written constitutions was, to form an *efficient* government, working by majorities, and at the same time protect the rights of minorities. This protection is given in the constitution, not only by the express limitations of the powers of legislation thereby granted, but also, as well expressed by

The People *v.* Conover.

Judge Denio in the case of *The People* v. *Draper*, by limitations implied from the frame of the government, the grant of legislative power itself, and other express grants in the constitution. It is a most extraordinary doctrine to say, that these limitations of the power of the legislature are to be looked upon with suspicion, as repudiating the power of the people. The legislature does not represent the people, but only a majority of the people. Courts, by giving full force and effect to a constitutional limitation according to its real purpose and intent, having reference to the constitution itself as the construction of a limited government only, do give full force and effect to the sovereign power of the people; while at the same time by so doing, they protect the rights of the minority; or of the city, town, &c. in whose favor a right may have been reserved. It is the duty of the court to construe these limitations unembarrassed by European analogies. And in the case of a plain legislative evasion of the constitution, it is the duty of the court to charge upon the legislature any motive the evasion would plainly imply. The restrictions in the constitution imply that the legislature might not always have public motives for their acts.

With these views of the constitution and of its limitations, which are certainly not out of place in considering the questions in this case, and which are given with reference to somewhat different views advanced by counsel on the argument; and looking upon the 2d section of article 10 of the constitution as intended to secure to cities, towns, &c. the right of electing or appointing the officers of their then local existing offices, in all cases; I think the governor had no constitutional right, under the act of February 3, 1849, or otherwise, to appoint the defendant to the office of street commissioner of the city of New York on the death of Taylor.

But was the act of February 3, 1849, intended to give the governor any such power? This brings me to the consideration of other objections taken by the plaintiff to the defend-

ant's title under that act. It would certainly seem not very probable that the legislature, in passing the act of February 3, 1849, had in view any such office as street commissioner of the city of New York. Without reference to any constitutional objection, it would seem that the convenience of government would not have permitted them intentionally to impose on the governor, the filling of vacancies to occur from time to time in all the petty city, town and village offices in the state. It is therefore doubtful, although all public offices, including the most petty village office, are, in one sense, offices of the state, whether the legislature, in using those words in the act of February 3, 1849, did not use them with reference to the classification of state officers in the revised statutes, and to the recognition in the constitution, of city, town and village offices, as distinguished from state offices. However this may be, the amended charter of the city of New York, passed April 2, 1849, at the same session as the act of February 3d, may be looked upon as a legislative construction by the same legislature that passed the act of February 3d, not only of section 2 of article 10 of the constitution, but of the act of February 3d. By section 20 of the amended charter of 1849, the heads of the departments, except the Croton aqueduct board, were to be elected every three years by the people; and in case of a vacancy in any of said heads of departments, by removal from office or otherwise, the mayor, with advice, &c. of the board of aldermen, had power to fill the same, until filled by the electors at the next charter election. The office of street commissioner ceased to be elective by the amended charter of 1857, and there is certainly much force in the plaintiffs' objection to Conover's title, that the act of February 3d, 1849, only applies to elective offices. By the act, the appointee of the governor to fill the vacancy must be " *eligible to the office, &c."* and he is " to execute the duties thereof until the commencement of the political year next succeeding the first annual election after the happening of the vacancy," &c. It is *said* that Conover's term, if his appointment is

The People *v.* Conover.

valid, must be without limitation, as there is never to be any election to fill the office.

I come now to the consideration of the right of the mayor to appoint Devlin under the act of 1857; and whatever may be the construction of the act of February 3, 1849, and however constitutional, if Devlin's appointment under the act of 1857 is valid, Conover's is void. The amended charter of 1857 appears to have been passed, not only for a partial reconstruction of the city government, but to legislate some of the then city officers out of office, and others in. By section 51, the offices of commissioners of repairs and supplies, and of commissioner of streets and lamps, were abolished; the comptroller, counsel to the corporation, street commissioner, city inspector, and the officers of the Croton aqueduct department then in office were continued in office until the expiration of their several terms; all other persons elected under former laws, then in office, including the mayor, aldermen, &c. were continued in office until the first election for charter officers under the act; which was to take place on the first Tuesday of December, 1857. When the act was passed and took effect, Mr. Wood was mayor, elected in November, 1856, for the term of two years; and Mr. Taylor was street commissioner, elected in November, 1855, for the term of three years from the first Monday of January, 1856. By section 54, all the old charters and acts amending the charters, since that of Dongan and Montgomerie, were repealed. By the 19th section, the mayor, comptroller and counsel to the corporation, are to be elected; the mayor for the term of two years; the counsel to the corporation for the term of three years, &c. The other heads of departments (including the street commissioner) "shall be appointed by the mayor, with the advice and consent of the board of aldermen." By section 20, the mayor, comptroller, and counsel to the corporation, may be removed by the governor, for cause; and the vacancy occasioned by the removal of the comptroller, or counsel to the corporation, shall be filled by the mayor, with the advice, &c. By section 21, the other

heads of the executive departments (including street commissioner) shall hold their office for two years, and until the appointment of their successors. By section 1, " The mayor, aldermen and commonalty of the city of New York" shall continue to be a body politic, &c., with all the grants, powers and privileges heretofore had by " the mayor, aldermen and commonalty of the city of New York." There is no section or provision prescribing or defining the general powers and duties of the mayor ; nor is there any specific provision in the act, limiting the power of appointment given by section 19, to a mayor elected under the act; or the general right of appointment given by section 19, to the single case of *a vacancy created by efflux of time*, so that neither the then mayor continued in office by the act, or the present mayor elected at the first election, under the act, if so limited, would have had a right to fill the office at any time before the expiration of the term for which Mr. Taylor was elected. Nor is there any specific clause or provision declaring that the powers or duties prescribed for the other offices, whose incumbents were continued in office by the act, were not intended to be given and prescribed for the officers so continued in office. (*See* §§ 1, 6, 8, 10, 11, 16, 17, *&c.*) There is no reason, and I know of no rule of construction or precedent which would authorize us in saying, that the general power of appointment given by section 19, did not authorize the mayor so continued in office, to fill the office, on the death of Mr. Taylor, if the general power thereby given to the mayor &c., was conferred on him, as *continued in office*, by section 51. The appointing power being always at hand, ready to act, there was no need of a special provision distinguishing between the appointment, or right of appointment to fill the office, as a vacancy might occur by casualty, or by the expiration of the term, from efflux of time.

It is difficult to find a precedent of legislation providing for filling vacancies in offices filled by appointment, prior to the constitution of 1846. That constitution made many offices elective, which were not so before ; and hence the act of

The People *v.* Conover.

Feb. 3, 1849.   If, therefore, this general power of appointment was intended to be given to the then mayor of the city, so continued in office, we hold that Devlin's appointment by the mayor was valid, although for the full term of the office, as fixed by the new act, and not for the unexpired term for which Taylor was elected.   Now, why did not the act give that power, as well as all other general powers given to the mayor, by the title of the office, to the then mayor so continued in office ? It would be absurd, as said by Judge Denio, in the *People* v. *Draper*, to continue an officer in office, without the functions of the office.   It is the functions and duties of an office that make the office, and why did not the mayor so continued in office, take the power or function of appointment under section 19, as well as other powers and functions given by the act, or by the old charters, or any unrepealed provisions of former laws ?

But the counsel for the defendant insists, that by continuing the then mayor in office, it was not intended that he should have any of the new powers conferred on the office of mayor, by the act, but that he might continue to exercise the *necessary duties of the office*—such duties only as were implied in the existence of the office; that it is manifest from the act that it was passed under a distrust of the then city government, and to protect the citizens against certain officials, at the head of whom was the then mayor ; and that the legislature never could have meant that the then existing mayor (Wood) should have the power to appoint the agents with whom the new mayor to be elected under the act, was to carry out the work of reform.   If the act was not passed from public motives, but with the particular views insisted upon by the counsel, it is perhaps a sufficient answer to his construction of the act, derived therefrom, to say, that the legislature probably did not suppose that Mr. Taylor would die so soon ; and, therefore, did not think of providing in any way against the mayor, whom they so continued in office, exercising the general power of appointment on the happening of such a contingency.

The counsel further insists, that all the old charters, except

Vol. XXVI.          68

that of Dongan and Montgomerie, being repealed, such officers as were continued in office by the new act, were, after the act, *statutory officers created by the act;* that Taylor's office of street commissioner thereby became a statutory office, to expire on the 1st of January, 1859, he deriving all his powers as an officer from the act of 1857; and that it follows, that neither the then mayor so continued in office, nor the present mayor, could appoint or remove a street commissioner (or other officer continued in office by the act) till the expiration of the term for which he was elected under the old charters; and that in case of a vacancy happening in the office before the expiration of that term, the governor alone could fill it by appointment, under the act of February 3, 1849. Now, the charter, or act, under which Taylor was elected, may have been repealed by the act of 1857; yet his office was not abolished, but continued; and his election and term of office were recognized and continued by the act of 1857. Section 25, which declares that there shall be an executive department to be denominated the street department, which shall have cognizance of opening, altering, &c., streets, &c., the chief officer of which shall be called street commissioner, &c., does not create a new department, with a new chief office, and new chief officer, to commence or go into operation on the expiration of the term for which Taylor was elected; but, like sections 24, 25, continues, and perhaps partially reconstructs, an old department with its chief office and officer; and this continuance is an exception in the act itself to the operation of the general repealing section, 54. Taylor's office was not created, but continued, by the act. Taylor was continued in it until the expiration of the term for which he had been elected, unless he should sooner die, resign, or be removed; when vacant by death, resignation, removal, or the expiration of the term for which he had been elected, it was no longer to be filled by the electors, but by appointment.

The same act which made Taylor a statutory officer, gives to the statutory mayor the general statutory power of appointment

Broderick *v.* Smith.

and removal; and there is nothing in the act to show that this power of appointment was to be suspended to let in the power of the governor under the act of February 3, 1849, whatever may be the construction of that act, or its constitutional validity. I do not think that the legislature had any such intention.

I think the legislature, when it continued the mayor and others of the city officers in office under the new charter, meant to give them, and did give them, all the powers and functions conferred by it on their offices, except where they may have otherwise expressly provided; and there being no express provision limiting the power of appointment in section 19, or suspending its operation, I think the mayor so continued in office had the power; and that Devlin's appointment was valid, and Conover's void.

CLERKE, J. concurred.

Judgment for the plaintiffs.

[NEW YORK GENERAL TERM, February 1, 1858. *Davies, Clerke* and *Sutherland*, Justices.]